IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 19, 2004 Session

## KEITH ROBERT ALLEN, ET AL. v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. 99,001,933    William Baker, Commissioner**

_____

**No. M2003-00905-COA-R3-CV - Filed August 3, 2004**

_____

The Claims Commission awarded damages to Plaintiffs individually and as administrators of the Estate of their son, Robert Keith Allen. The state was held liable under Tennessee Code Annotated section 9-8-307(a)(1)(I) and (J). We affirm the judgment of the Claims Commission.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Tennessee Claims Commission Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Dawn Jordan, and Rebecca Lyford, Assistant Attorneys General, for the appellant, State of Tennessee.

R. Curtis Mabbitt, Muskegon, Michigan and Richard T. Matthews, Columbia, Tennessee, for the appellees, Keith Robert Allen, and wife, Carol Elizabeth Allen, Individually and as Administrators of the Estate of Robert Keith Allen.

**OPINION**

This case centers around a fatal traffic accident that occurred on Campbellsville Pike in Maury County, Tennessee on June 19, 1998. Campbellsville Pike is a state-constructed and maintained public highway traversing in pertinent part southern Maury County and northern Giles County. Observing that there was little serious controversy as to the facts of the case, the Claims Commission found:

> On June 19th, 1998, Allen and Jeffrey Mayfield left Allen's home to go to church in Columbia. Later they went to a local Wal-Mart; then they left the Wal-Mart to go back to Allen's home. Mayfield was driving. Their route took them southbound [on Campbellsville Pike.] It had been raining, they had their vehicle's headlights on, and they entered an "S" curve portion of the highway. In the second

turn of this stretch of highway, the rear of the pickup truck they were driving in slid off the right side of the pavement. Mayfield lost control of the truck, and it headed toward a ditch on the left side of the highway. The truck crossed the center line and went into the ditch. The right front wheel hit a culvert; the pickup truck rolled over, ending upside down in the northbound lane of the highway with the passenger side of the truck facing south.

Mayfield was able to get out of the truck, but Allen was trapped inside. Mayfield spoke to Allen while he tried to get Allen out. At this point, Mayfield saw a northbound vehicle coming, and he was able to get out of its way before it hit the upside-down truck in which Allen was still trapped.

Adam Kinney was the driver of that northbound vehicle. He was on his way to work when he came around a curve on Campbellsville Pike. Kinney testified that he saw the headlights of the Mayfield truck. But it was physically impossible for him to see those headlights because the truck's lights were pointed in a different direction; he may have seen the headlights of a southbound vehicle which had stopped to render assistance, or he may just have seen the upside-down truck in his own headlights and become confused in the excitement. This Commission finds that Kinney did try to stop his vehicle; unfortunately that effort proved unsuccessful, and Kinney's vehicle crashed into the Mayfield pickup truck. Allen was killed in this collision.

Plaintiffs brought suit in the Tennessee Claims Commission based upon Tennessee Code Annotated section 9-8-307(a)(1)(I) and (J), which provide that the state may be held liable in tort (subject to monetary limitations provided elsewhere in the statute) for:

(I)     Negligence in planning and programming for, inspection of, design of, preparation of plans for, approval of plans for, and construction of, public roads, streets, highways, or bridges and similar structures, and negligence in maintenance of highways, and bridges and similar structures, designated by the department of transportation as being on the state system of highways or the state system of interstate highways;

(J)     Dangerous conditions on state maintained highways. The claimant under this subsection must establish the foreseeability of the risk and notice given to the proper state officials at a time sufficiently prior to the injury for the state to have taken appropriate measures;

The most critical issue presented on appeal in this case is "discretionary function immunity." While the instant appeal was pending this court decided *Phillip Lucas, et al. v. State of Tennessee*, and *Michael E. Collins, et al. v. State of Tennessee*, No. M2002-02810-COA-R9-CV- S.W.3d _____, 2004 WL 223373 (Tenn.Ct.App. 2004) perm.app.denied June 21, 2004). In *Lucas*, after extensive consideration of Tennessee Code Annotated section 9-8-307(d), this Court concluded that:

Subject to monetary caps and limitations to actual damages and court costs, the Claims Commission Act was a sweeping abrogation of sovereign immunity. *Hembree v. State*, 925 S.W.2d 513 (Tenn.1996). It was the same broad waiver of sovereign immunity as was effected in *Savage*, 899 P.2d 1270 (Wash.1995). By way of exception to this broad abrogation, the legislature gave back to the state the right to plead absolute immunity. The legislature specifically prohibited the state from relying on "good faith" immunity. The controlling point is that no matter how one may define "discretionary function" immunity it cannot be defined as an absolute immunity, and since the statute restricts the state to the defense of absolute immunity only, it necessarily follows that the State simply cannot rely on "discretionary function" immunity.

2004 WL 223373, *20 (Tenn.Ct.App. Feb. 4, 2004).

The supreme court having denied permission to appeal and directed the publication of the court of appeals' opinion pursuant to Supreme Court Rule 4(D), the decision is controlling authority in this case, and the defense based on "discretionary function" immunity is not available to the state.

Since the briefs of the parties in this case were filed on August 15, 2003 and September 11, 2003 respectively and the *Lucas* opinion was not released until February 4, 2004, no mention of *Lucas* could be made in the briefs. In argument of the case at bar, on March 19, 2004, the state was faced with the *Lucas* opinion and, while not abandoning the issue of "discretionary function" immunity at least pending any action by the supreme court on the *Lucas* appeal, the state was compelled to redirect its argument. Resourceful counsel for the state picked up on the "duty" discussion in *Lucas* wherein this Court determined that on remand Plaintiff still had the burden under principles set forth in *Doe v. Linder Constr. Co., Inc.*, 845 S.W.2d 173, 178 (Tenn. 1992); *Staples v. C.B.L. & Assoc., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000); *McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d 891, 895 (Tenn. 1996) and *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995), to establish a duty owing to the plaintiff by the defendant. We concluded the discussion of the "duty" question in *Lucas* by observing:

> Thus, under general tort law principles, the feasibility and costs associated with correcting a dangerous condition or taking other steps to avoid injury because of that condition would be factors relevant to a determination of duty, not a bar to recovery by an injured plaintiff. Our Supreme Court has applied traditional tort theories to claims under the Claims Commission Act, pursuant to Tenn. Code Ann. § 9-8-307(c). *See Stewart v. State*, 33 S.W.3d 785, 793 (Tenn. 2000) (applying common law principles of assumption of a duty where one is not legally imposed to a claim for negligent control).

2004 WL 223373, *20 (Tenn.Ct.App. 2004) (footnote omitted).

The difficulty with the position of the state is that the "duty" issue was never raised in the trial court nor in the issues asserted by the state on appeal in this Court. It arises for the first time

-3-

in oral argument subsequent to the release of the *Lucas* opinion. The "duty" issue is not dependent on the availability of the defense of "discretionary function" immunity but, by general tort principles, is an integral part of Plaintiffs' burden of proof. *Staples v. C.B.L. & Assoc., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). In analyzing this "duty" element of Plaintiffs' burden of proof the supreme court has held:

> Duty is the legal obligation a defendant owes to a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm. *See McClung v. Delta Square Ltd. Partnership*, 937 S.W.2d at 894; *McCall v. Wilder*, 913 S.W.2d at 153. In assessing whether a duty is owed in a particular case, courts must apply a balancing approach, based upon principles of fairness, to identify whether the risk to the plaintiff was unreasonable. *See Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997). This Court has stated that a "risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm." *McCall v. Wilder*, 913 S.W.2d at 153; *Rice v. Sabir*, 979 S.W.2d at 308. The court must consider several factors in determining whether a risk is an unreasonable one, including:
>
> > the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance [or] social value of the activity engaged in by defendant; the usefulness [of] the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.
>
> *Coln v. City of Savannah*, 966 S.W.2d 34, 39 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d at 153.

*Id.* at 89.

Existence of a "duty" is the first element of any tort case whether the action is brought against private or governmental entities. The fact that certain of the factors involved in the "duty" analysis (the feasability of alternative, safer conduct and the relative costs and burdens associated with that conduct) may also be considered in determining whether or not an affected governmental entity is engaged in a "discretionary function" is coincidental and not related to the "duty" analysis. The "duty" discussion in *Lucas* is not relevant in the case at bar. This case has already been tried on its merits in the Claims Commission and comes before this Court on direct appeal. Direct appeals from the Tennessee Claims Commission are governed by the Tennessee Rules of Appellate Procedure. Tenn. Code Ann. § 9-8-403(a)(1). Appellate review is *de novo* upon the record of the Commission with a presumption of correctness of the Commissioner's Findings of fact. *Sanders v. State*, 783 S.W.2d 948, 951 (Tenn.Ct.App. 1989).

*Lucas* was before the court prior to trial on the merits pursuant to the grant by this Court of a T.R.A.P. rule 9 interlocutory appeal limited solely to the issue of discretionary function immunity. On remand in *Lucas*, all issues except discretionary function immunity remained viable. It was in the context of the remand and the anticipated trial on the merits that the "duty" discussion occurred in *Lucas*.

The intervening issuance and affirmance of *Lucas* while this case was on appeal provides no basis for excepting the instant controversy from the general rule that issues not raised in the trial court but instead raised for the first time on appeal will not be considered by the appellate court. *Simpson v. Frontier Community Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983); *City of Elizabethton v. Carter Co.*, 321 S.W.2d 822, 827 (1958); *Harrison v. Shrader*, 569 S.W.2d 822, 827 (1978).

The only other issue raised by the state on appeal is whether the Claims Commission properly found that the State of Tennessee had notice of an alleged dangerous condition. The Claims Commission held the state liable in this case, under both provisions of the statute finding:

> This Commission concludes that the State's conduct about the maintenance of that part of Campbellsville Pike that is relevant to this claim constituted "negligence in maintenance of highways," as that phrase appears in Tennessee Code Annotated section 9-8-307(a)(1)(I), and that the State's conduct resulted in the existence of "dangerous conditions on state maintained highways," as that phrase is used in Tennessee Code Annotated section 9-8-307(a)(1)(J).

The notice issue is applicable only as a prerequisite to liability of the state under Tennessee Code Annotated section 9-8-307(a)(1)(J). Notice is not a factor in determining the liability of the state under Tennessee Code Annotated section 9-8-307(a)(1)(I).

On April 14, 2004, the Eastern Section of this Court decided a case strikingly similar to the case at bar involving the notice issue and the same provisions of the Tennessee Claims Commission Act. *Alice June Atkins & Clara Ollie Needham v. State of Tennessee*, No. E-2003-01255-COA-R3-CV 2004 WL 787166 (Tenn.Ct.App. April 14, 2004). In that case the Claims Commission emphasized the significance of the notice provision in what was treated as by the Court of Appeals as a T.R.C.P. 41.02(2) motion at the conclusion of the plaintiff's proof.

> At the close of plaintiffs' proof on the Motion by the State of a directed verdict, the Commissioner held on the issue of notice that there was no evidence of notice to the State as required in Tenn. Code Ann. § 9-8-307(a)(1)(c) and (J), and the action was dismissed as to these sections for failure to prove notice to the State of a dangerous condition. The case proceeded to judgment on plaintiffs' claim under § 9-8-307(a)(1)(I).

*Atkins*, at *3.

At the conclusion of the trial the Commissioner took the matter under advisement and afterwards issued his judgment establishing the liability of the state based on a finding that the state was 100% at fault for the accident under Tennessee Code Annotated section 9-8-307(a)(1)(I). In affirming the judgment of the Claims Commission this Court held:

Negligence and proximate cause are fact questions, unless the evidence and reasonable inferences therefrom are so free of conflict that all reasonable minds must agree upon the conclusion. *Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993); *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994). In this case the Commissioner had the opportunity to see and observe each witness and assess her credibility. He meticulously reviewed every witness and exhibit *in seriatum* in a 42 page opinion. The Commissioner assessed the weight and credibility of the experts as well as the other witnesses in his capacity as the trier of fact, and chose between conflicting and competing testimony. *See generally, Krick v. City of Lawrenceburg*, 945 S.W.2d 709, 712 (Tenn. 1997); *State v. Flake*, 88 S.W.3d 540 (Tenn. 2002). The evidence in this record does not preponderate against his finding of fault. Tenn. R. App. P. 13(d). *Realty Shop v. R.R. Westminster Holding*, 7 S.W. 3d 581, 596 (Tenn.Ct.App. 1999), <u>citing</u>, *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn.Ct.App. 1992). In view of our findings, we pretermit the plaintiffs' appeal of the Commissioner's exclusion of the expert opinion portions of a State employee's deposition.

*Id.* at *6.

In the instant claim Commissioner W.R. Baker detailed his findings of fact and conclusions of law in a carefully considered 29 page opinion. He found the state liable under both sections (I) and (J) of the statute.

The proof in this case shows, without contradiction, that the roadway where this accident occurred was extremely slick and particularly so when the surface was wet. Investigative officers Diaz and Wray testified to the slippery condition of the roadway at the time of the accident as did witnesses Mayfield and Kinney. The State does not dispute the slippery condition of the highway.

The slippery condition of the road being undisputed, the Claims Commission focused on the question of why the roadway was so slick. The focus of the inquiry turned to disputes in expert testimony and disputes between general specifications for road surface materials and contract documents mandating a variance with such general specifications. The Claims Commissioner accepted the expert evidence of Plaintiffs in preference to the expert evidence offered by Defendant. In so doing the Claims Commissioner made a credibility call which as in *Atkins & Needham v. State* must be given proper deference on appeal. *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn.Ct.App. 1998).

It is undisputed that 100% limestone was used as the coarse aggregate on the portion of Campbellsville Pike involved in the accident. The state, through its expert testimony, asserted that

such coarse aggregate was acceptable for construction of this road surface. The expert testimony for Plaintiffs asserted to the contrary and further asserted that the Tennessee Standard Specifications for Road and Bridge Constructions in effect at the time the road was surfaced in 1984 did not allow for 100% limestone aggregate. The state countered with the argument that a discrepancy existed between the plans used for this highway and the specifications contained in the Tennessee Standard Specifications for Road and Bridge Construction and that in such cases the surface aggregate specified in the plans prevailed over general road specifications.

Plaintiffs expert, Charles Hughes, was a research civil engineer holding a Master's Degree in Civil Engineering from the University of Virginia, having been employed for thirty-three years as a civil engineer in the research arm of the Department of Transportation of the State of Virginia. He had retired in 1991 from the State of Virginia and was a self-employed consultant in asphalt quality assurance at the time he testified in this case. In testifying regarding the Tennessee Standard Specifications for Road and Bridge Construction and also based upon his own experience Mr. Hughes testified:

> Q. In describing the type of aggregate that can be used in a CW mix, does it allow one hundred percent (100%) limestone?
> A. It says, coarse aggregate. And then they define coarse aggregate that contains a number four (No. 4) sieve, which is about a quarter of an inch. Anything larger than a quarter inch, they consider to be coarse aggregate. And that is a general standard.
> . . . .
> THE WITNESS: (Reading) Coarse aggregate. Aggregate retained on a number four (No. 4) sieve shall be crushed stone, crushed gravel, crushed slag, or combinations of these materials produced in sizes designated in subsection 903.22. So it does not limit the use of limestone in that mix.
> BY MR. LOHR:
> Q. Now let me ask you - -
> THE WITNESS: These mixes.
> Q. Let me ask you based upon - - not upon these standards but upon your professional experience and background, do you see anything inappropriate with using a hundred percent (100%) limestone for the aggregate on a base mix?
> A. Not a base or a leveling course.
> Q. Okay. And is there a section in that specification in that exhibit that deals with surface layers?
> A. Yes. Okay. Section 903.08 on page 721. Aggregates for bituminous road mix surface course. And then there is - - well, that is - - that is the one I wanted to - -
> Q. Well, I guess I was looking at Section 411.
> A. Okay, go back to 411?
> Q. Let's go back to 411.
> A. Okay. 411 is asphalt concrete surface, parenthesis, hot mix.

. . . .

Q. What kind of grades do they allow for surface mixes?

A. It says asphalt cement used with aggregate grading D and F in a preparation of asphalt concrete surface mixes.

Q. Okay. So there you have not - - Does it allow for CW mixes to be used as a surface mix?

A. No, it doesn't. There is nothing in here. Nothing in this section about a CW mix.

Q. If you were to look for, say, a D, a D mix, what type of aggregate is allowed there?

A. We have to go back over to the middle aggregate, which is 903.11. 903.11 is aggregate for asphalt concrete surface courses. And that is page 723. It has coarse aggregate. And under grading D, it says the middle aggregate shall consist of crushed gravel, crushed granite, crushed slag, crushed quartzite, crushed calcareous sandstone, crushed gneiss, in combination with natural sand or sand manufactured from gravel, slag or calcareous sandstone.

And then there is a grading F.

Q. Let me back up on the grading D for a surface mix, does it allow limestone?

A. It says the use of carbonate rocks such as limestone and dolomite or other aggregates tending to polish under traffic will not be permitted in the coarse aggregate and will be permitted only to the extent specified therein of the fine aggregate.

Q. So for the coarse aggregate, can you use limestone on a D surface mix?

A. No.

Q. Okay, now, you said there is also an E surface mix, right?

A. Right. It says Grading D is to be used as a surface for traffic lanes, the mineral aggregate shall be - - when Grading E is to be used as the surface for traffic lanes, the mineral aggregate shall be composed of not less than fifty percent (50%) nor more than fifty-five percent (55%) crushed limestone and not more than fifty percent (50%) or not less than forty-five percent (45%) natural sand, slag sand, sand manufactured from gravel or any combination of these materials except herein specified.

Q. Now even if you were to put a Grade E mix on the surface, a Grade E surface mix, does that allow a hundred percent (100%) limestone for the coarse aggregate?

A. No, it does not. It limits it to fifty-five percent (55%).

Q. Okay. In this case, the surface course that was on the roadway, the CW mix, it had what for the coarse aggregate?

A. It had limestone as the coarse aggregate and the percent was a hundred percent (100%) limestone, the coarse aggregate.

Q.      Does that, in your opinion, comply with the specifications that we have - - that Tennessee has with regard to - - as outlined in Exhibit 13?

A.      It doesn't.  It does not.

Q.      Okay. Now setting aside the specifications that the State of Tennessee has, in your opinion, should a roadway such as this ever be built with a hot mix plant mix bituminous surface in which the large aggregate is a hundred percent (100%) limestone?

A.      No.  I couldn't - - I don't think that they ought to use a hundred percent (100%) limestone on a mix of this type on a roadway of this type.

Q.      What is the most - - the largest percentage of limestone that should - - that, in your opinion, should be used?

A.      They allow fifty-five percent (55%); my experience says that fifty percent (50%) is the maximum that should be used.

Q.      Okay.  Now why should you not use a hundred percent (100%) limestone as the large aggregate on a roadway like this?

A.      Limestone is known, generally known under the many state specifications, as becoming slippery.  It tends to polish, which means that the surface of it will polish like a gem, a precious stone, and become slippery.  It doesn't have any macro texture to it so there is no - - nothing there to grab the tire.

Gregory Martin Duncan, expert witness testifying for the state, held a Master's Degree in civil engineering from Auburn University and was employed by the Tennessee Department of Transportation.  While he, along with other experts for the state, maintained that 100% limestone aggregate was properly used in construction of this portion of Campbellsville Pike, he acknowledged the well known effect of time and traffic on 100% limestone aggregate used in road surfaces.

Q.      The thing with limestone is that when it wears, the microtexture goes off and it just kind of - - That may be an exaggeration, but it - - it kind of just wears smooth.  And those little - - those little pot marks wear off and it becomes smooth; right?

A.      As a - - As a function of time and traffic.

Q.      Well, yeah.  And, then, when that microtexture - - when it loses its microtexture, then it starts becoming slippery, doesn't it?

A.      The measured coefficient of friction can go down as - - as the aggregate polishes and wears.

Q.      Does Tennessee have a trigger value for coefficient of friction?

A.      We don't have a - - a trigger in value that when you reach this level, you - - you must do this or you must do a certain thing or - - or anything like that.

Q.      You do have a level, though, where if you get below it that that letter is generated or something like that?

A.      Right.  We - - We take an informational approach to it.  Our Materials and Tests Division does not set up projects for repaving or reconstruction or anything like that.  And we take a value of thirty-five (35%) to be a level where the regional

engineer that is responsible for that area of roadways needs to - - to become aware that the - - that a roadway is at this level of friction. It is not a you must repave or you must microsurface or you must improve it or anything like that, it is more a, this is an area that you may need [to] watch for a few years to see if it continues to - - to go down or - - or if this is about where it levels off.

The testimony thus establishes that the state was aware that 100% limestone aggregate had been used in surfacing this portion of Campbellsville Pike and was aware that time, wear, and road conditions would produce conditions such as faced Allen and Mayfield on the evening of June 19, 1998. The Commission concluded that "the state's conduct about the maintenance of that part of Campbellsville Pike that is relevant to this claim constituted 'negligence in maintenance of highways,' as that phrase appears in Tennessee Code Annotated section 9-8-307(a)(1)(I)." When the evidence is considered with proper deference to the credibility determination made by the Commissioner the evidence does not preponderate against the findings of the trial court relative to 307(a)(1)(I).

As was the case in *Atkins & Needham v. State*, Tennessee Code Annotated Section 9-8-307(a)(1)(I) is a proper basis for finding liability of the state without regard to Tennessee Code Annotated section 9-8-307(a)(1)(J). The provisions requiring "notice" are only applicable to subsection (J) and not to subsection (I). In view of our holding as to the liability of the state under subsection (I) it is not necessary to further consider the liability of the state under subsection (J) but it suffices us to say that we do not find that the evidence preponderates against the finding of the Claims Commission that the state had notice of the existence of "dangerous conditions on state-maintained highways," within the meaning of subsection (J). Aside from the state's knowledge of the propensity of 100% limestone aggregate in road surfaces to become slippery with wear and tear, the Claims Commission found:

The anecdotal reports of the condition of this stretch of Campbellsville Pike and of other incidents resulting from the slick nature of the highway surface support the conclusion that the slickness of the highway was a long-standing problem rather than just an isolated instance.

Since 1992 Mr. and Mrs. Boyd had lived on a portion of Campbellsville Pike near where the accident in question occurred and had had the opportunity to observe the condition of the highway's surface. Mr. Boyd compared the condition of the highway's surface after a rain to a covering of ice. Mr. Boyd also testified not only to having had repeated difficulty in maintaining control of his own vehicle on this highway, but also to his having witnessed another driver [lose] control, go off the road, and flip his vehicle at between 25 and 35 miles an hour on this highway. The similarity of this incident to that involving Allen is obvious. Mrs. Boyd testified that it was difficult even to stand on the road's surface after a rain, and her testimony is consistent with the testimony of the eye witnesses about the condition of the road on the day of the events in question. She also reported having skidded in her car on this road at thirty miles an hour.

Oscar Sims similarly testified that this highway became so slick after a rain that an individual would have difficulty standing on it. He had complained to State-highway maintenance personnel about the dangerously slick condition of this highway on two separate occasions before Allen's death.

Sergeant Diaz testified that, in his years of experience as a law-enforcement officer, he has never seen another road become as slick as Campbellsville Pike.

Officer Wray referred to the slick condition of Campbellsville Pike as common knowledge in the community.

Consistent with this testimony, in October 1993 the Maury County Legislative body had passed a resolution stating that Campbellsville Pike was hazardous, and requesting the State to take action to address this hazard.

Kinney testified to having been warned on the very day in question about the tendency of Campbellsville Pike to become slick.

Moreover, this anecdotal evidence supports, and in turn is supported by, the scientific evidence noted above, and the eye-witness testimony about conditions on the day of the fatal accident in question. The testimony of Mr. Boyd, that the number of accidents on that portion of Campbellsville Pike near their home increased each year after 1992 (when they first moved into this home), supports the testimony of Hughes that the limestone aggregate used to resurface this highway in 1984 would grow progressively more polished and slick over time. The testimony of Mrs. Boyd, that the rate of accidents occurring on the half-mile stretch of Campbellsville Pike immediately north of the county line diminished after the resurfacing of that roadway, supports the conclusion drawn from the skid-meter test results that the limestone coating applied during 1984 was the cause of the slickness, and that the new coating applied to the first half mile of this stretch of highway during the early 1990's corrected the problem.

The evidence established that the accident in issue occurred north of the half-mile stretch of the road that was resurfaced in the early 1990's. The proof does not preponderate against the Claims Commission's determination that the state had "notice" of the dangerous condition of this portion of Campbellsville Pike under Tennessee Code Annotated section 9-8-307(a)(1)(J). As the state does not take issue on appeal with the determination that Plaintiff suffered damages in the amount of $259,800 we will not disturb the finding as to damages. The judgment of the Claims Commission is in all respects affirmed and costs are assessed to the State of Tennessee. The case is remanded to the Claims commission for enforcement of the judgment.

_____
WILLIAM B. CAIN, JUDGE

-11-